**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**RECO EQUIPMENT, INC.,**

      **Plaintiff,**

                                    **Case No. 2:20-cv-3556**

      **vs.**                        **Chief Magistrate Judge Elizabeth P. Deavers**

**JEFFREY S. WILSON,** *et al.***,**

      **Defendants.**

## OPINION AND ORDER

Plaintiff RECO Equipment, Inc. ("RECO") filed this action on July 15, 2020, seeking preliminary and permanent injunctive relief and damages against Defendant Jeffrey S. Wilson ("Wilson") asserting claims for breach of contract and misappropriation of trade secrets. (ECF No. 1.) On July 24, 2020, RECO filed a First Amended Complaint for Preliminary and Permanent Injunctive Relief and Damages adding new claims and defendants. (ECF No. 10.) In addition to Wilson, RECO names in its amended pleading as Defendants Joseph Craig Russo ("Russo"), Republic Equipment Holding LLC ("Republic"), and John Does #1 and #2. Further, RECO asserts in its amended pleading claims for breach of contract, theft and misappropriation of trade secrets under the Ohio Uniform Trade Secrets Act ("OUTSA"), and theft and misappropriation of corporate opportunity.

On September 20, 2020, RECO filed a Motion for Preliminary Injunction. (ECF No. 20.)[1] Defendants filed a Response on October 13, 2020. (ECF No. 26.) RECO filed its Reply

---

[1] On July 30, 2020, the parties enter into an Agreed Order on Plaintiff RECO Equipment, Inc.'s Motion for Preliminary Injunction as to Defendant Wilson. (ECF No. 13.) On October 20,

on October 27, 2020. (ECF No. 33.) With the consent of the parties and pursuant to 28 U.S.C. §

636(c), by Order of Reference dated October 16, 2020 (ECF No. 31), this matter was referred to

the Undersigned for the conduct of all further proceedings. For the following reasons, Plaintiff's

Motion for Preliminary Injunction (ECF No. 20) is **GRANTED**.

## I.     RELEVANT BACKGROUND

The Court held an evidentiary hearing on the preliminary injunction motion on November

13, 2020. RECO presented testimony and evidence from Joshua Gasber, RECO's co-owner,

Vice President, and Board member ("Gasber"); Sara Bagford, RECO's IT Manager and Systems

Administrator ("Bagford"); Brett Creasy, an independently retained certified computer forensic

examiner ("Creasy"); and Chad Gilman, RECO's Director of Sales ("Gilman"). Defendants

rested at the conclusion of RECO's presentation without presenting any testimony or evidence.

Accordingly, the following relevant factual background is taken from the testimony and evidence

received at the hearing and the affidavits, declarations, and evidentiary materials submitted in

connection with the parties' briefing on the preliminary injunction motion.

## A.     RECO

RECO is an Ohio corporation headquartered in Belmont County, Ohio. (Tr. at 14;

Affidavit and Verification of Joshua Gasber "Gasber Aff.", ECF No. 20-1, at ¶ 2.) RECO,

founded in 1983, is engaged in the buying, selling, leasing, servicing, repairing, and rebuilding of

large-scale industrial, construction, and mining equipment. (Tr. at 13, 15; Gasber Aff., at ¶ 2.)

RECO operates and provides services in 40 states throughout the Midwest and Southern United

---

2020, the parties agreed to extend the Agreed Order through the hearing date. (ECF No. 32.) At
the hearing, a continuation of the Agreed Order was agreed upon. (Tr. at 165.)

States. (Tr. at 15-16; Gasber Aff. at ¶ 3.)  The nucleus of its business is located in Belmont, Ohio.  (Tr. at 14; Gasber Aff. at ¶¶3-4.)  RECO currently has more than 220 employees, over 80 of whom are service technicians located throughout several locations in seven states throughout the Midwest and Southern United States.  (Tr. at 16, 19; Gasber Aff. at ¶ 6.)

RECO became a dealer for Liebherr USA, Inc. and its subsidiaries ("Liebherr") in 1994, and began selling Liebherr material handlers in 1998.  (Tr. at  17; Gasber Aff. at ¶ 8.)  In 2014, RECO purchased Republic Crane and Equipment Company's Liebherr operations and dealer agreements. These agreements initially covered Georgia, Kentucky, parts of North Carolina, South Carolina, Tennessee, Virginia, West Virginia, and Florida. Liebherr, over the objections of RECO, ultimately decided to remove Florida from RECO's Liebherr operations and dealer agreements footprint because it did not want RECO's territorial footprint to become too large. (Tr. at 16; Gasber Aff. at ¶ 12.)  When RECO purchased Republic Crane in 2014, RECO hired all of Republic Crane's employees including Wilson and Russo.  (Tr. at 17-18.)

RECO has spent years developing technical expertise in the maintenance, servicing, and rebuilding of certain equipment including, but not limited to, Liebherr A944Cs; Liebherr A934s; Liebherr Wheel Loaders; and Liebherr R944Cs. This expertise is not generally known within the industry, and is a primary reason why RECO has been financially successful.  (Tr. at 18; Gasber Aff. at ¶ 9.)  At the evidentiary hearing, Mr. Gasper specifically testified as follows:

> Q.· · · · ·Do you think -- what is RECO's specialty in terms of being able to provide the best service at a solid price, things like that?
>
> A.· · · · ·Yeah.· We've -- like I said, we've been in business since 1983. We've -- you know, through the -- through those years, we gained a lot of experience, because we sell a lot of machines.  We have -- you know, we're one of the largest kind of second-tier dealerships is what I refer to it. So we get -- you know, there's a large population of machines.· We have a lot of -- you know, a lot of experience.· And we capture a lot of that experience and try to put on training to share that information.  We have about 80 technicians that do work.· And, you know, it's very

difficult to – to attract and train these technicians.· And the equipment, it's -- it's interesting because the -- the work on construction equipment used to be kind of thought of as a sledgehammer job, that it was, you know, a guy with a wrench that maybe wasn't -- was uneducated to do repair.· And it -- today it's very technical, involving, you know, computers, specialized knowledge, the ability to read blueprints of, you know, schematics of wiring and hydraulic functions.· So it's -- it's a technical job to do.

Q.· · · · ·Okay.· When you're completing these rebuilds and repair and servicing, are records kept?

A.· · · · ·Yes.

Q.· · · · ·Okay.· And are these records – what are they -- what's in the records?

A.· · · · ·All the parts that were used in the repair, you know, we capture records of what the work that was done by the technicians.· If they found -- you know, there's a lot of troubleshooting involved, so oftentimes it will -- the problems are novel, things break in unique ways, and we capture that information.· And – you know, and disseminate it back through the workforce to try to -- again, the more efficient we can be to -- in repairing things, the more -- you know, the better our reputation is, the better -- you know, hopefully the more profitable we can be.

(Tr. at 19-20.)

RECO spent years cultivating relationships with its customers. These relationships have allowed RECO to obtain a voluminous amount of data about its customers and their equipment. This information includes, but is not limited to (1) service, maintenance, and repair records for all equipment serviced or otherwise worked on by RECO; (2) notes regarding issues; (3) fee schedules for completed maintenance, repairs, and/or rebuilds; and (4) cost reports and breakdowns for specific repairs and rebuilds.  This information is confidential and proprietary, not generally known within the industry, and cannot be purchased or otherwise obtained on the open market.  (Gasber Aff. at ¶ 10.)  RECO has used the expertise, skills, knowledge, and information it has garnered over its years in operation to specialize in the rebuilding of Liebherr material handlers in order to significantly extend the useful life of the piece of equipment. Acquiring Liebherr material handlers at the end of their life and rebuilding them has become a

4

successful and significant aspect of RECO's business. (Gasber Aff. at ¶ 11.) RECO has expressed interest, and continues to express interest, in becoming a dealer and handling Liebherr's operations in Florida and RECO has provided service, replacement parts, and equipment to customers operating in Florida who have been unable to obtain such service, replacement parts, and equipment from Florida dealers. (Gasber Aff. at ¶ 12.)

**B.     Russo's Employment with RECO**

Russo had been a service manager at Republic Crane for years. His early duties at RECO included branch product support, parts, service and equipment at a facility, customer calls, and managing profitability of a specific location. (Tr. at 22.) RECO promoted Russo to Regional Operations Manager for the southern region including the Indiana, Ohio, Kentucky, Tennessee, and North Carolina regions. (Tr. at 22-23.) This was an executive level role. (Tr. at 23.) In this role, Russo was involved in document and data creation, developing training processes, and in establishing RECO's "business gateway." (Tr. at 23.) This "business gateway," developed over hundreds of hours, was designed to enable technicians to have quick problem-solving ability. In RECO's experience, not all machine problems were the same and it was useful to catalog and track "novel" issues and resolutions as they arose. (Tr. at 23-24.) Nothing in RECO's purchase contract with Republic Crane gave Russo the rights to ownership in anything he created or compiled although he was compensated for the development and creation of the materials. (Tr. at 25.) He was probably in the top six or seven highest compensated employees in the company. (Tr. at 25.) Russo was never an officer or shareholder of RECO and did not have a written employment agreement or written non-compete agreement. (Tr. at 25-26.) Russo resigned on July 20, 2020, after RECO filed this lawsuit. (Tr. at 39.)

As RECO was working through Wilson's exit, it became concerned about Wilson's obligations under his employment agreement.  (Tr. at 39-40.)  When Russo tendered his resignation, RECO learned Russo had moved and downloaded files to his personal email and Dropbox files.  At his exit interview, Russo informed RECO that he was going into business with Wilson to service machinery for the David J. Joseph Company ("DJJ") in Florida.  (Tr. at 42.)

RECO began an investigation of Russo's computer activity.  Some background is in order. RECO uses a distributed file system, the DFS, which entails each branch having a server at its location that the employees' files are backed up to and is replicated around to a main controller server that is located off site.  RECO uses the G Suite of products for employees' e-mail, Google Drive, calendar, hangout conversations, chatting with each other as well the gateway for internal Web sites that contain  internal data for the employees' use that they have to have a username and password to access.  (Tr.  at 79.)  The DFS as well as Google Drive are both stored in the Cloud and the file system is stored off site and is replicated around to 15 different servers as a back-up. (Tr. at 80.)

As the Systems Administrator, Bagford has access to all employees' records and information, as well as their e-mail and their computers.  (Tr. at  80.)  All computers and laptops are put on RECO's domain, which allows Bagford to access them and push out updates to them to investigate, to be able to jump in to troubleshoot and help with items, or to "clean things up" in the event of  a data breach or virus issue.  (*Id*.)  Bagford also periodically checks users' activities at the direction of RECO's owners.  If she detects a red-flag that causes her suspicion, she will investigate that user's activity further.  (Tr. at 80-81.)

On July 10th, while Bagford was talking to Russo on the phone because he was having a computer issue, she "jumped" into his computer to help.  At that time, she noticed that he had

synced his entire computer to Dropbox and had downloaded Dropbox sync for his computer the previous day. (Tr. at 81.) This was Bagford's initial red flag. Bagford also noticed that Russo's "My Documents" folder was empty and that the Windows sync was also off. Further, she noticed that Russo had another e-mail client running on his computer, which was not Gmail. (Tr. at 81-82.) Bagford noted that it is not the normal practice for a RECO employee to have their information backing up to Dropbox. Bagford testified that in one limited circumstance, Ed Rowe, a 30-plus year employee, was permitted to download information to a Dropbox folder when he was having computer issues. (Tr. at 82-83.) Bagford was aware that Russo had a Dropbox to share machine downloads with field technicians. (Tr. at 82.)

Besides the removal of his "My Documents" from RECO's network in March, Bagford found that Russo had cleared out his "My Documents" folders so that it was empty. This removed it all from RECO's servers. She also discovered that Russo had been doing bulk downloads from Google Drive in June 2020. Russo requested 41 bulk downloads and 422 files and folders from his Google Drive account. Because he had his computer backing up to Dropbox, anything that he would have downloaded to that laptop would have automatically gone into Dropbox as well. So all of the information that Russo downloaded would have been downloaded to his laptop and gone up to Dropbox. Bagford discovered that Russo also had done some Google Takeouts on June 9th one where he requested 51 products from Google, including a backup of his e-mail. This would have included every e-mail that he ever sent or received with all attachments from RECO while he had been employed by RECO. On July 15th, Russo did another Takeout of 42 products. Bagford found records of Russo requesting access to customer documents that were actually owned by another employee asking them to give him ownership of

them.  These included numerous documents that broke down the machines and repairs and parts list for machines owned by DJJ.  (Tr. at 82-87.)

In February 2020, Russo purchased a Dropbox account with his RECO credit card.  The account initially was linked to his  company e-mail address but  he eventually changed the e-mail address on his Dropbox to his personal e-mail account.  (Tr. at 91; Plaintiff's Exh. 7.)  This is not a normal business practice for RECO employees.  Bagford also discovered that, on July 15th, Russo forwarded documents from his Google Takeout to an e-mail address at Republic.  (Tr. at 86; Plaintiff's Exh. 9.)  This would allow Russo to download and every single piece of data that was in his Google Suite account and to do "whatever he wants with them", including uploading them into another Gmail account, or saving the data for future use.  (Tr. at 82-83.)  Because RECO utilizes Google Suite, an employee can access e-mail from anywhere, so there is no reason an employee would need to e-mail documents to a personal e-mail account.  (Tr. at 92-93, 94.)

When an employee leaves RECO, they must provide their iCloud account for their phone, the pass code for the lock for their phone, and any pass codes that could be on their laptop or PC. (Tr. 95-96.)  Upon his departure, however, Russo did not follow these protocols. Instead, he changed the iCloud account to his personal account, did a full factory reset on his phone, removing his iCloud account and all data and did not return his old laptop.  (Tr. at 96-97.)

Files removed from Russo's computer could still be available if saved in Dropbox, unless steps were taken to remove them specifically from Dropbox.  (Tr. at 114.)  Forensic analysis revealed that USB devices were connected to Russo's computer as late as July 21, 2020.  (Tr. at 117.)

C.      **Wilson's Employment with RECO**

When Wilson, a North Carolina resident, was first hired by RECO, he served as Director of National Accounts.  This was the same role he previously had held with Republic Crane.  (Tr. at 122, 124.)  When he first began with RECO, he did not have an employment agreement.  In 2018, Wilson expressed an interest in ownership in the company and needed to broaden his skill set to include managing people.  (Tr. at 125.)  He was elevated to a Regional Sales Manager position and, in fall 2018, began a transition period where he maintained the dual roles of Director of National Accounts and Regional Sales Manager.  (Tr. at 124-125.)  Wilson did not express any discontent with his dual roles until approximately three months before his resignation.  (Tr. at 125.)

In January 2019, during a meeting at RECO's offices in Belmont, Ohio, Gilman presented Wilson with an employment agreement.  (Tr. at 129; Plaintiff's Ex. 1.)  RECO was requiring Wilson to enter into such an agreement to formalize his role, responsibilities, territory, accounts, and compensation.  (Tr. at 129-130.)  According to Mr. Gillman, all commissioned sales employees were being put under employment contracts.  He testified that Wilson's failure to sign an employment agreement would have resulted in the loss or modification of his employment.  (Tr. at 129.)  RECO, including Reed Mahaney, was "on board" with Wilson's employment agreement but Mahaney was not involved in negotiating the agreement.  (Tr. at 132.)  Wilson signed the agreement that night.  (Tr. at 134-36.)  Gilman signed the agreement as a witness to Wilson's signature.  (Tr. at 136.)  Gasber signed the agreement on RECO's behalf.

Neither Gasber nor Gilman was aware of any issues with Wilson's employment agreement until the filing of this lawsuit.  (Tr. at 128, 137-140.)  Gilman considered the signed agreement, including the initialed changes, to be a final agreement.  (Tr. at 134.)  Gilman was

9

under the impression that Wilson signed the agreement believing that such agreements ultimately were "as worthless as the paper they're written on." (Tr. at 136.) Following Wilson's signing, Wilson and Gilman went to dinner and never spoke of the agreement again. (Tr. at 137-139.)

Wilson resigned from RECO on June 9, 2020. (*E.g.*, Tr. at 39.) Several months prior to his resignation, and fearing that he would be fired, Wilson personally formed JW Trading LLC, in North Carolina, on January 22, 2020. (Wilson Affidavit, ECF No. 26-1, at ¶ 14.) Between that date and Wilson's resignation, JW Trading LLC was not used. (*Id.* at ¶ 16.) On July 15, 2020, Republic Equipment Holding, LLC was formed. (*Id.* at ¶ 18.) Prior to this formation, Wilson had purchased Republic Equipment LLC for the use of Republic's name and for its goodwill. (*Id.* at ¶ 19.) After his resignation, Wilson contacted Trademark Metals, presumably a subsidiary of DJJ located in Florida, about doing business with them. (*Id.* at ¶ 31.)

## II. CHOICE OF LAW

In order to determine which states' choice of law principles are applicable, "[a] federal court sitting in diversity must apply the law of the forum state." *Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 949 (S.D. Ohio 2002); *Baker v. Hughes Inc. v. S&S Chem., LLC*, 865 F.3d 554, 560 (6th Cir. 2016). Accordingly, Ohio choice of law principles will determine which law should be applied here.

Ohio follows the Restatement (Second) of Conflict of Laws, requiring the Court to determine whether the cause of action sounds in contract or tort before applying the choice of law principles. This is so because different choice of law principles apply to different causes of action. *Wiggins v. Bank of Am., N. Am.*, No. 2:19-CV-3223, 2020 WL 5642422, at *14 (S.D. Ohio Sept. 22, 2020) (citing *Ohayon v. Safeco Inc. Co. of Ill*, 757 N.E.2d 206 (Ohio 2001) (citing

Restatement (Second) Conflict of Law at 18, § 17, cmt. b).  As noted, RECO's Complaint contains both contract and tort claims.

For choice of law questions involving contract claims, the Ohio Supreme Court has adopted sections 187 and 188 of the Restatement. *Worthington Indus., Inc. v. Inland Kenworth (US), Inc.*, No. 2:19-CV-3348, 2020 WL 1309053, at *18 (S.D. Ohio Mar. 18, 2020*) (*citing *Jamhour*, 211 F. Supp. 2d 949; *see also Schulke Radio Prod. Ltd. v. Midwestern Broad. Co.*, 6 Ohio St.3d 436, 453 N.E.2d 683 (1983) (adopting section 187); *Gries Sports Ent. Inc., v. Modell*, 15 Ohio St.3d 284, 473 N.E.2d 807 (1984) (adopting section 188).

Section 188 provides that in absence of effective choice of law by the parties, their rights and duties under the contract are determined by the law of the state that has "the most significant relationship to the transaction and parties." Restatement (Second) of Conflicts § 188. Specifically, the Restatement provides the court should consider:

> i. the place of contracting;
> ii. the place of negotiations of the contract;
> iii. the place of performance;
> iv. the location of the subject matter of the contract; and
> v. the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Id.* § 188(2).

Additionally, the Restatement directs the Court to follow these instructions:

> i. A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
> ii. When there is no such directive, the factors relevant to the choice of the applicable rule of law include:
>
> 1. the needs of the interstate and international systems;
> 2. the relevant policies of the forum;
> 3. the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
> 4. the protection of justified expectations;
> 5. the basic policies underlying the particular field of law;

6. certainty, predictability, and uniformity of result; and

7. ease in the determination and application of the law to be applied.

(*Id.* § 6.) *Worthington Indus.,* 2020 WL 1309053 at *18–20 (S.D. Ohio Mar. 18, 2020). Within this "framework, a judge must balance principles, policies, factors, weights, and emphasis to reach a result, the derivation of which, in all honesty, does not proceed with mathematical precision." *Id.* (quoting *Med. Mutual v. Denise DeSoto*, 245 F.3d 561, 571 (6th Cir. 2001)).

Applying the above principles, the Court concludes that Ohio law should govern Wilson's employment contract. Looking to the place of contracting and the place of the negotiations, the testimony demonstrates that the contract was negotiated and signed in Belmont, Ohio. (Tr. at 130.) Further, although Wilson was a resident of North Carolina, in his role as the Director of National Accounts and a Regional Sales Manager, he handled accounts in North Carolina, Tennessee, Arizona, Texas, Kansas, Florida, Indiana, and Ohio. (Declaration of Jeffrey S. Wilson, ECF 26-1, at ¶ 8.) Under the terms of his contract, however, Wilson reported to Chad Gilman in the Belmont, Ohio office. (Tr. 127.) Further, in his role, Wilson did not have the authority to sign sales contracts, this was the responsibility of RECO's owners only. (Defendants' Hearing Exhibit 5.) Further, the subject matter of the contract – Wilson's employment – was with a company headquartered in Ohio; his equipment sales were approved and processed through the Ohio office; and his compensation was authorized and directed from Ohio. (*See* Affidavit of Joshua Gasber, ECF 20-1, at ¶¶ 3-5.) All of these factors demonstrate that Ohio is the state with the most significant relationship to the transaction and the parties. Wilson's domicile in North Carolina, standing alone, is insufficient to outweigh the combination of these other factors. His arguments to the contrary are wholly unpersuasive.

With respect to the remaining claims, in tort actions, Ohio courts look to the §§ 145 and 146 of the Restatement for guidance. *Wiggins* 2020 WL 5642422, at *16–17 (citing *Avery*

*Dennison Corp. v. Juhasz*, 924 F. Supp. 2d 893, 897 (N.D. Ohio 2013). "'Section 146 of the Second Restatement creates a presumption in tort actions that the substantive law of the place of injury controls unless another jurisdiction has a more significant relationship to the lawsuit.'" *Id.* (quoting *Phelps v. McClellan*, 30 F.3d 658, 661 (6th Cir. 1994)). Section 145 of the Restatement offers several factors to be used in determining the state with the most significant relationship to the issue. Under § 145, a court must determine the applicable law as follows:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

(*Id.*) (citing Restatement (Second) of Conflict of Laws § 145 (1971). These factors "are to be evaluated according to their relative importance with respect to the particular issue." *Id.* This issue does not warrant much discussion. The place of the alleged injury – the misappropriation of RECO's trade secrets and the corresponding harm to RECO – is Ohio. Defendants do not contend otherwise. Accordingly, the Court concludes that Ohio law governs this claim as well.

### III. STANDARD OF REVIEW

It is well settled that preliminary injunctions are extraordinary remedies which should be granted only if the movant carries its burden of proving that the circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Because of its "limited purpose," a preliminary injunction is "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). Accordingly, a party need not prove its case in full at a preliminary injunction hearing. *Id.* Whether to grant such relief is a matter within the discretion of the district court. *N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 166-67 (6th Cir. 1989).

Courts consider four factors when determining whether to grant a request for a preliminary injunction. Those factors include (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). A party seeking an injunction must establish each element of its case by clear and convincing evidence. *Handel's Enterprises, Inc. v. Schulenburg*, 765 F. A'ppx 117, 124 (6th Cir. 2019); *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331 (6th Cir. 1998) (citing *Garlock, Inc. v. United Seal, Inc.,* 404 F.2d 256, 257 (6th Cir. 1968)); *see also Bertec Corp. v. Sparta Software Corp.*, No. 2:19-CV-04623, 2019 WL 7249259, at *2 (S.D. Ohio Dec. 27, 2019) (same).

Courts generally balance these factors. *See, e.g.*, *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). District courts weigh the strength of the four factors against one another. Yet, even a strong showing on the other three factors cannot "eliminate the irreparable harm requirement." *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982). This factor is paramount. If the plaintiff is not facing imminent and

irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit. *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (citing *Friendship Materials*, 679 F.2d at 103; Wright et al., *supra*, § 2948.1 (recognizing irreparable injury is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction[.]")).  A district court abuses its discretion "when it grants a preliminary injunction without making specific findings of irreparable injury[.]"  *Id.*  (quoting *Friendship Materials*, 679 F.2d at 105).  Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory.  To merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical.  *Id.* (quotations omitted).

## IV.  ANALYSIS

### A.    Likelihood of Success on the Merits

The first factor the Court must address is RECO's likelihood of success on the merits of its claims.  In order to show a likelihood of success on the merits, "a plaintiff must show more than a mere possibility of success."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (citing *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.,* 119 F.3d 393, 402 (6th Cir. 1997)).  RECO limits its request for injunctive relief is to only two of its claims – its breach of contract claim against Wilson (Count I) and its misappropriation of trade secrets claim against Wilson, Russo, and Republic Equipment (Count II).[2]  Accordingly, the Court must consider RECO's likelihood of success on each of these claims.

---

[2] RECO's third claim, asserting the theft and misappropriation of corporate opportunity (Count III), is the subject of a pending and fully-briefed motion to dismiss.  (ECF Nos. 17, 21, and 23.)

### 1.     Breach of Contract Claim (Count I)

RECO brings a claim against Wilson for breach of an employment agreement (the "Employment Agreement"), dated January 23, 2019, which includes a non-competition clause, as well as other terms regarding RECO's trade secrets and intellectual property rights.  (*See* ECF No. 10 at PAGEID ## 103-114.)  As set forth above, the Employment Agreement is governed by Ohio law.

To prove a breach of contract under Ohio law, a party must prove four elements: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting damages.  *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006).  A covenant not to compete, "which imposes unreasonable restrictions upon an employee[,] will be enforced to the extent necessary to protect the employer's legitimate interests.  A covenant restraining an employee from competing with his [or her] former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public."  *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 25-26, 325 N.E.2d 544, 547 (1975).

Here, RECO argues all four elements are met.  First, RECO submits as evidence the Employment Agreement itself, which is executed by both parties and initialed throughout to reflect mutually agreed-upon revisions.  (*See* ECF No. 10 at PAGEID ## 103-114; *see also* Tr. at 134-5.)  RECO argues that Wilson performed and provided notice of resignation under the Employment Agreement, which was the basis of Wilson's compensation during 2019, and that Wilson never challenged his compensation or advised RECO that he believed the Employment Agreement had not been executed.  (ECF No. 20 at PAGEID ## 274, 283.)  RECO further argues that Wilson breached Sections 3.02 (Agreement Not To Compete) and 3.09 (Disputes) of the

16

Employment Agreement,[3] and that RECO is entitled to damages as a result. (*Id.* at PAGEID ##
283-284; *see also* ECF No. 10 at PAGEID ## 92-94.)

In response, Wilson does not challenge that the last three elements of the breach of

contract analysis are present. Specifically, Wilson does not contest that he performed and was

compensated under the terms in the Employment Agreement, that he breached the terms of the

Employment Agreement, or that RECO has suffered resulting damages. (*See generally* ECF

Nos. 15, 26.) Therefore, the dispute before the Court turns on the first element of RECO's

breach of contract claim: whether the Employment Agreement is a valid and enforceable

contract between RECO and Wilson. In the underlying briefing,[4] Wilson raises several

arguments to the effect that the Employment Agreement is not a valid and enforceable contract,

including (a) the Employment Agreement was in fact "an abandoned <u>draft</u> of a <u>proposed</u>, to-be-

still-negotiated, agreement"; (b) there was no meeting of the minds; (c) the non-competition

sections of the Employment Agreement are void and unenforceable for lack of consideration

_____

[3] Section 3.09 states in relevant part that "[e]xcept for the right to seek injunctive relief as set
forth in Section 3.08, all disputes arising hereunder shall be referred to binding arbitration to be
conducted under the Uniform Arbitration Act as adopted in Ohio, to be conducted before a single
arbitrator in St. Clairsville, Ohio." (ECF No. 10 at PAGEID # 111.) Relatedly, Section 3.08
states in relevant part that in the event of any breach or threatened breach of Sections 3.03, 3.04,
3.05, or 3.06 of the Employment Agreement, RECO "shall be entitled to an injunction from a
court of competent jurisdiction . . . ." (*Id.* at PAGEID ## 108-111.) Because RECO only alleges
breach of Sections 3.02 and 3.09, Section 3.08 does not apply to the subject dispute. As for
Section 3.09, while counsel for Defendants raised the matter tangentially in conference, it is
unclear why neither party has sought to enforce this binding arbitration provision. This Court
routinely enforces arbitration provisions and compels arbitration. *United States ex rel. Hicks v.
Evercare Hosp.*, No. 1:12-CV-887, 2015 WL 4498744, at *2 (S.D. Ohio July 23, 2015). It is of
no consequence, however, because this issue is not presently before the Court.

[4] Wilson does not affirmatively attack the validity of the Employment Agreement in response to
the subject Motion for Preliminary Injunction, ECF No. 20. Rather, Wilson's attacks on the
validity of the Employment Agreement were set forth in response to RECO's first motion for
preliminary injunction, ECF No. 5. (*See* ECF No. 15.) In response to the subject Motion,
Wilson expressly incorporated by reference the briefing related to RECO's first motion for
preliminary injunction. (ECF No. 26 at PAGEID # 451.)

under North Carolina law; and (d) under North Carolina or Ohio law, the non-competition section of the Employment Agreement are unenforceable for overbreadth and lack of reasonableness. (*See* ECF No. 15 at PAGEID ## 187, 203-220 (emphasis in original).) The Court will address these arguments in pairs, as the first two arguments are related, as are the last two.

### a.     Duress; Meeting of the Minds

As to the first two arguments, Wilson emphasizes the circumstances under which he signed the Employment Agreement. Specifically, Wilson characterizes his contract signing as an "ambush," stating that RECO presented him with a contract at approximately 4:30 p.m., months after his job duties had changed, and insisted that he sign the contract that night. (*See* Declaration of Jeffrey S. Wilson, ECF No. 15-1, at PAGEID ## 228-229.) Wilson claims he was told by RECO President Reed Mahany that he (Wilson) "would not execute any enforceable written agreement that night with RECO." (*Id.* at PAGEID # 230.) Rather, Wilson states that he previously had told Mahany he "would not be subject to any written agreement," and when Wilson spoke to Mahany about the Employment Agreement that night, Wilson told Mahany that he (Wilson) "would not agree to any terms until [Wilson] consulted with an attorney" to review revised language. (*Id.* at PAGEID ## 228-230.) Wilson submits that he then signed the Employment Agreement with this understanding. (*Id.* at PAGEID # 230.) Wilson further contends he "never received any further copy of the proposed agreement until served with this lawsuit." (*Id.*) Thus, Wilson argues that under these circumstances, the Employment Agreement was only a draft, abandoned by RECO until this lawsuit, and that there was no requisite meeting of the minds. (*See* ECF No. 15 at PAGEID ## 187, 203-220.)

Wilson's arguments are not well taken. In Ohio, for contract formation to occur, the parties must objectively manifest an intent to be bound. *Jones v. U-Haul Co. of Massachusetts*

18

& *Ohio Inc.*, 16 F. Supp. 3d 922, 933 (S.D. Ohio 2014) (citing *McSweeney v. Jackson,* 117 Ohio

App.3d 623, 631-632, 691 N.E.2d 303, 308 (Ohio Ct. App. 1996)).  Indeed, "Ohio law does not

require contracting parties to share a subjective meeting of the minds to establish a valid

contract; otherwise, no matter how clearly the parties wrote their contract, one party could escape

its requirements simply by contending that it did not understand them at the time.  What it does

require is that the terms of the agreement establish an objective meeting of the minds, which is to

say that the contract was clear and unambiguous."  *216 Jamaica Avenue, LLC v. S & R*

*Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir.2008) (citing *Nilavar v. Osborn*, 127 Ohio

App.3d 1, 711 N.E.2d 726, 733 (1998)); *see also Bennett v. Heidinger*, 30 Ohio App.3d 267,

268, 507 N.E.2d 1162, 1164 (Ohio Ct. App. 1986) ("The relevant inquiry is the manifestation of

intent of the parties as seen through the eyes of a reasonable observer, rather than the subjective

intention of the parties.").

Critically, Wilson has not cited or submitted any evidence in support of his arguments

other than his own subjective understanding of events.[5]  His subjective beliefs, however, are not

enough because the "mental reservation of a party to a bargain does not impair the obligation he

purports to undertake."  *Bruzzese v. Chesapeake Expl., LLC*, 998 F. Supp. 2d 663, 673 (S.D.

Ohio 2014) (citing Restatement of Contracts 2d § 17, cmt. c).  Under Ohio law, when Wilson

signed the Employment Agreement on January 23, 2019, he objectively evidenced an intent to be

bound by its terms, including the restrictive covenants therein.  *Jones*, 16 F. Supp. 3d at 933.

---

[5] While Wilson submitted testimony by sworn Declaration, he chose not to testify at the
preliminary injunction hearing, depriving RECO's counsel of the opportunity to cross-examine
him.  By contrast, RECO's witness Chad Gilman, who was the only other person with direct
knowledge of the alleged contract negotiation with Wilson, testified at the preliminary injunction
hearing and was subject to cross-examination.

Regardless of Wilson's subjective desire not to be bound by the Employment Agreement, especially once he reviewed its provisions, Wilson's signature on the Employment Agreement was objectively binding.  "One who signs a contract is presumed to know its contents, and ... if he has had an opportunity to read the contract which he signs he is bound by its provisions." *Jones*, 16 F. Supp. 3d at 933–34 (citing *Sears, Roebuck & Co. v. Lea*, 198 F.2d 1012, 1015 (6th Cir. 1952)).  "A person of ordinary mind cannot say that he or she is misled into signing an agreement that is different from the agreement the person intended to sign, when that person could have ascertained what agreement he was entering into by merely reading it when he signed it." *W.K. v. Farrell*, 167 Ohio App.3d 14, 853 N.E.2d 728, 732 (Ohio Ct. App. 2006) (citing *Haller v. Borror Corp.*, 50 Ohio St.3d 10, 14, 552 N.E.2d 207, 210 (1990)).

Here, the objective evidence, including but not limited to testimony that Wilson never complained about or questioned the existence of the agreement, actively negotiated the agreement as evidenced by three discrete changes to the terms certified by initials, and his comments that it was "as worthless as the paper [it was] written on," confirms the existence of the employment agreement.

### b.  Enforceability of Non-Compete Agreement

Wilson's remaining arguments relate to the enforceability of Section 3.02 of the Employment Agreement, the non-competition provision.  Assuming, as the Court has found, that the Employment Agreement is a valid contract between RECO and Wilson, Wilson argues that Section 3.02 is nevertheless unenforceable for lack of consideration and for overbreadth and lack of reasonableness.  (ECF No. 15 at PAGEID ## 213-218.)

As a preliminary matter, to the extent Wilson relies on North Carolina law for this dispute, he is mistaken – Ohio law governs this dispute.  Accordingly, Wilson's first argument,

that Section 3.02 is unenforceable for lack of consideration, is misplaced.  While Wilson argues

that "North Carolina law bars the enforcement of, and holds void, non-competition covenants

that are not supported by new, additional consideration, beyond merely continued employment,"

ECF No. 15 at PAGEID # 213, the same is not true under Ohio law.  *See Alloy Bellows &*

*Precision Welding, Inc. v. Cole*, No. 1:15CV494, 2016 WL 1618108, at *6 (N.D. Ohio Apr. 22,

2016) ("Plaintiff correctly states that continued employment is sufficient consideration to make

the Non-Compete and Non-Disclosure agreements enforceable."); *see also Lake Land Emp't.*

*Grp. of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 804 N.E.2d 27 (Ohio 2004) (A

noncompete agreement presented by an employer to an existing employee to sign as a condition

for continued employment is supported by consideration).

The Court will similarly refuse to consider Wilson's second argument, that Section 3.02

is unenforceable for overbreadth and lack of reasonableness under North Carolina law, but Ohio

law on this issue warrants discussion.  As Wilson correctly observes, Ohio courts disfavor

restrictive covenants, which are "scrutinized carefully to ensure their intended effect is not to

prevent competition, but to protect a legitimate business interest."  *Millennium Health, LLC v.*

*Christopher Roberts*, No. 1:19CV2381, 2020 WL 2814440, at *10 (N.D. Ohio Mar. 4, 2020),

*report and recommendation adopted sub nom. Millennium Health, LLC v. Roberts*, No. 1:19 CV

2381, 2020 WL 2812871 (N.D. Ohio May 29, 2020) (internal citations omitted).  Nevertheless,

they are a fact of "modern economic realities" and are not strictly prohibited.  *Horter Inv. Mgmt.,*

*LLC v. Cutter*, 257 F. Supp. 3d 892, 901 (S.D. Ohio 2017).  Under Ohio law, a non-compete

covenant is reasonable if it (1) is no greater than is required for the protection of the employer;

(2) does not impose undue hardship on the employee, and (3) is not injurious to the public.

*Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007) (citing *Raimonde*, 42

21

Ohio St.2d 21). Ultimately, the reasonableness of a non-compete covenant "is determined on a case-by-case basis." *Handel's Enterprises, Inc.*, 765 F. App'x at 123-24 (citing *FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 526 (6th Cir. 2013)).

Reasonable non-compete agreements are enforced as written. *AK Steel Corp. v. Miskovich*, No. 1:14CV174, 2014 WL 11881029, at \*10 (S.D. Ohio April 17, 2014) (citing *Raimonde*, 42 Ohio St.2d at 26). Courts are to consider the following factors in assessing reasonableness:

> [W]hether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and experience, whether the benefit to the employer is disproportionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment.

*Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (citing *Raimonde*, 325 N.E.2d at 547)).

The provision at issue is Section 3.02 of the Employment Agreement, which reads in its entirety:

> 3.02 Agreement Not To Compete. Employee covenants and agrees that for a period of thirty-six (36) months following Employee's last day of employment with Company, Employee shall not:
>
> (a) Engage in any Competitive Activity (as defined below) with the Prohibited Territory (as defined below); or
>
> (b) As an employee, agent, partner, shareholder, member, investor, director, consultant, or otherwise assist others to engage in Competitive Activity within the Prohibited Territory.
>
> "Competitive Activity" means: (a) engaging in any aspect of the Business (as defined below) with which Employee was involved on behalf of Company at any time during the last 12 months of Employee's employment with Company; (b) engaging in work for a competitor of Company that is substantially similar to the work Employee performed on behalf of Company at any time during the last 12 months of employment with the Company; and/or (c) engaging in any work for a

22

competitor of Company that is likely, in the sole determination of Company, to result in Employee's use or disclosure of any Confidential Information (as defined below).

The "Business" means the business of selling and leasing construction, mining, and industrial equipment and of providing maintenance and repair services (including the sale of new and replacement parts) for construction, mining, and industrial equipment.

"Prohibited Territory" means the territory within a fifty (50) mile radius of Employee's Territory as described on Exhibit A hereto.

(ECF No. 10 at PAGEID ## 107-108.)

Although neither side solicited testimony on this issue, this provision appears to be designed to protect RECO's service strategies, customer information and relationships. These are recognized as legitimate business interests. *AK Steel Corp.*, 2014 WL 11881029, at *11. When an employee has access to confidential information, and when an employee's customer contacts occurred because of his employment, a legitimate business interest is likely to be present. *Invacare Corp. v. Nordquist*, No. 1:18-cv-62, 2018 WL 2454523, at *4 (N.D. Ohio June 1, 2018). A state appellate court expanded on this issue:

> An employer has a legitimate interest in limiting not only a former employee's ability to take advantage of personal relationships the employee has developed while representing the employer to the employer's established client, but also in preventing a former employee from using his former employer's customer lists or contacts to solicit new customers. * * * In addition, an employer has a legitimate interest in preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business, regardless of whether it was an already established customer of the former employer.

*Century Bus. Servs., Inc. v. Urban*, 179 Ohio App. 3d 111, 123, 900 N.E.2d 1048, 1058 (Ohio Ct. App. 2008) (quoting *UZ Engineered Prods. v. Midwest Motor Supply Co., Inc.*, 147 Ohio App.3d 382, 396-397, 770 N.E.2d 1068 (Ohio Ct. App. 2001)).

Despite this, Wilson argues that RECO's "purported restrictions are neither reasonable nor tailored in time nor scope to be enforceable[.]" (ECF No. 15 at PAGEID # 217.)

23

Specifically, Wilson argues that barring "Competitive Activity" in a "Prohibited Territory" for a period of thirty-six (36) months after the last date of employment "stifle[s] any semblance of fair competition, prohibiting Wilson from competing even where RECO is [] not in a position to offer its services." (*Id.*) Wilson does not expand on this much, however, and certainly fails to support his supposition of dire harm with any evidence. He points to no legal authority that the thirty-six month provision is unreasonable. In fact, Ohio courts regularly enforce similar, or longer, provisions. *See Parma Internatl., Inc. v. Herman*, Cuyahoga App. No. 54243, 1989 WL 12928, *2–4 (Ohio Ct. App. 1989) ("[T]he covenant between the parties prohibiting Herman from competing with Parma International [for five years] is reasonable."); *Raimonde*, 42 Ohio St.2d at 28 (upholding three-year limitation); *Wall v. Firelands Radiology, Inc.*, 106 Ohio App.3d 313, 331, 666 N.E.2d 235, 248 (Ohio Ct. App. 1995) (restrictive covenant which prevented plaintiff from competing with corporation for period of up to three years was enforceable); *Neer v. Clark*, Sandusky App. No. S–93–1, 1993 WL 496699, *2 (Ohio Ct. App. 1993) (affirming lower court finding that a three-year limitation was not excessive or unreasonable). Wilson's argument is not well taken, at least to the thirty-six month restriction. As discussed below, the Court is sympathetic to Wilson's claim about the scope of the restricted "Competitive Activity" under Section 3.02, but the Court's concern does not impact its analysis of the likelihood of RECO's success on the merits.

Accordingly, this Court finds that RECO has made a sufficient showing regarding the existence of a valid and enforceable contract between RECO and Wilson, for purposes of this Motion. Because Wilson does not contest any of the other elements of RECO's breach of contract claim, this Court finds that RECO has a strong likelihood of success on the merits of its breach of contract claim against Wilson (Count I).

### 2. Misappropriation of Trade Secrets Claim (Count II)

"In order to prevail on a misappropriation-of-trade-secret claim, a plaintiff must show by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008) (citing *Hoover Transp. Serv., Inc. v. Frye*, 77 Fed.Appx. 776, 782 (6th Cir. 2003) (per curiam)). The Court will address these issues in turn.

### a. Existence of a Trade Secret

"The question of whether something is a trade secret is a question of fact to be determined by the trier of fact upon the great weight of the evidence." *Handel's Enterprises, Inc.*, 765 F. App'x at 122 (citing *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003) (per curiam) (citing *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 24 Ohio St.3d 41, 492 N.E.2d 814 (1986))). The OUTSA defines a "trade secret" as:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D). The Ohio Supreme Court has adopted the following six factors for consideration in determining whether a plaintiff has shown the existence of a trade secret: (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of information; (4) the savings effected and the

value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquires and duplicate the information. *Premier Dealer Servs., Inc. v. Allegiance Admr's, LLC*, No. 2:18-CV-735, 2019 WL 1981864, at *5 (S.D. Ohio May 3, 2019) (citing *State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*, 687 N. E. 2d 661, 672 (1997)). Although no one factor is dispositive, the most important factor is whether "[a] business or possessor of a potential trade secret must take some active steps to maintain its secrecy." *Heartland Home Fin., Inc.*, 258 F. App'x at 862 (internal citations omitted). Those active steps need only be "reasonable" under the circumstances. *Id.*

Determining "whether information constitutes a trade secret is a highly fact-specific inquiry." *Wellington Res. Grp. LLC v. Beck Energy Corp.*, No. 2:12-cv-104, 2013 WL 5325911, at *5 (S.D. Ohio Sept. 20, 2013) (citing *DeBoer Structures Inc. v. Shaffer Tent & Awning Co.*, 233 F.Supp.2d 934, 948 (S.D. Ohio 2002)). Still, "[c]onclusory statements as to trade secret factors without supporting factual evidence are insufficient to meet the burden of establishing trade secret status." *Murray Energy Holdings Co. v. Bloomberg, L.P.*, 2016 WL 3355456, No. 2:15-CV-2845, at *7 (S.D. Ohio June 17, 2016) (quoting *Arnos v. MedCorp., Inc.*, No. L-09-1248, 2010 WL 1730139 at *3 (Ohio Ct. App. 2010)).

Here, at this juncture, the Court finds that RECO has made a sufficient showing that the information at issue constitutes trade secrets. As to the most important factor, RECO submitted uncontroverted evidence that the information regarding the manner in which it services and documents its customer experience, the process of providing service, repairs, rebuilds, all the parts that were used, the work done by technicians, the troubleshooting involved, the novel problems encountered. RECO disseminates this information back through the workforce so that

26

it can be more efficient and more profitable. (See Tr. at 20-21.) RECO documents patterns of problems and accompanying troubleshooting it experiences with a certain population of machines. Although originally it could take a technician days to fix a machine, by looking at stored data, RECO is able to more quickly diagnose a problem and repair equipment. (See Tr. at 24-25.)

This information was not publicly available and that RECO took active steps to maintain its secrecy. Specifically, RECO produced testimony, by written Declaration and during the evidentiary hearing, that (a) the information was password-protected; (b) the information was only available to employees as it is needed for their job; (c) RECO required both Wilson and Russo to acknowledge receipt of review of RECO's Employee Handbook, which sets forth confidentiality, non-disclosure, and conflict of interest provisions; and (d) RECO required all members of the sales department to be "put under" similar contracts as Wilson.. (*See* ECF No. 20-1 at PAGEID ## 295-296; Tr. at 31, 38-39.)

RECO also produced compelling evidence regarding the substantial money and time it had invested in developing that proprietary information. As Joshua Gasber, RECO's co-owner, Vice President, and Board member, testified, RECO's documents constitute the "secret sauce for [the] business," because those records reflected RECO's institutional knowledge regarding the myriad novel problems that RECO and its predecessors had encountered over the years. (*See* Tr. at 20, 36-38.) RECO submitted evidence that this information was not known outside the business, because "things break in unique ways," and RECO had invested the time in cataloging the myriad problems (and solutions) it had troubleshot over the years. (*Id.*) Gasber testified that providing this information to someone else would be detrimental to RECO, as it would essentially provide a "shortcut" to anyone who had not invested "millions of dollars and

countless hours to develop and capture" the information, as RECO had. (*Id.* at 20, 36-38, 45.) In short, Gasber testified that such information is what "gives [RECO] the difference" over the rest of its competitors within the industry. (*Id.* at 73.)

It thus appears clear from the limited record before the Court that the information at issue, regarding RECO's operations and procedures, meets the definition for trade secrets under the OUTSA. Accordingly, for purposes of current Motion, RECO has sufficiently alleged and provided evidence of the existence of trade secrets.

### b. Acquisition of a Trade Secret as a Result of a Confidential Relationship

The Court must next evaluate whether Defendants acquired the trade secrets as the result of a confidential relationship. This requirement is set out in the statutory definition of misappropriation, which includes the use of a trade secret of another by a person without the owner's express or implied consent while

> [a]t the time of ... [such] use, [the person] knew or had reason to know that the knowledge of the trade secret ... was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Ohio Rev. Code § 1333.61(B)(2)(b); *see also Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 861 (S.D. Ohio 2008).

Defendants reject the contention that the information at issue was acquired as a result of a confidential relationship, and argue that "most of the information cited by Plaintiff as being 'stolen' from RECO *belonged to Defendants (and not RECO)* to begin with." (ECF No. 26 at PAGEID 469 (emphasis in original).) Defendants highlight the combined forty-five years of knowledge and experience between Russo and Wilson, before working for RECO, and argue that "[t]he integrated, specialized knowledge of Defendants was precisely why RECO sought to

28

purchase a larger, more sophisticated, and better equipped distributor-turned-dealer such as Republic Crane, in 2014." (*Id.* at PAGEID # 469-470.)

In response, RECO stresses that its purchase of Republic Crane in 2014 included "all of the assets pertaining to or used by the Seller as a Liebherr licensed dealer of material-handling and construction equipment", including books, records, and information files, customer and inquiry lists, and goodwill. (ECF No. 33 at PAGEID # 552.) "Moreover, Republic Crane warranted that it was conveying all trade secrets, know-how, processes, technology, blueprints, and designs utilized in the business to RECO and that Republic Crane had no knowledge of any basis for the claims of other parties to such intangible property." (*Id.*) RECO argues that Russo and Wilson are just employees, they are not the owners of the subject information, and they are not entitled to take their employer's intellectual property with them, "even though [they] may have played a role in developing it for [their] employer." (*Id.* at PAGEID # 553.)

Given the nature of the information, the Court agrees with RECO. While Wilson and Russo undoubtedly carry the benefit of their training and experience with them, that is not what RECO alleges they have taken. Rather, RECO has identified hundreds if not thousands of its own documents that Defendants have acquired through activity that is suspicious at best, including "documents about RECO customers and the equipment they own; documents about RECO's pricing and costs; copies of RECO's service agreements with various customers; copies of RECO personnel files and evaluations; internal RECO documents regarding the company's business operations and finances; and a plethora of Liebherr documents and manuals that are only available to Liebherr dealers like RECO." (*See*, *e.g.*, ECF No. 20 at PAGEID # 276.) While Wilson and Russo arguably may have independent knowledge of the information contained within many of these documents, RECO has put forth sufficient evidence to show, at

29

this stage, that Defendants only acquired the documents as the result of their confidential

relationship with RECO.

c.       **Unauthorized Use of a Trade Secret**

Under the OUTSA, "misappropriation" means any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

> (a) Used improper means to acquire knowledge of the trade secret;

> (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

> (c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Aday v. Westfield Ins. Co.*, No. 1:18-CV-405, 2020 WL 5517243, at *11 (S.D. Ohio Sept. 14,

2020) (citing Ohio Rev. Code § 1333.61).  For purposes of the statute, "improper means"

includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to

maintain secrecy, or espionage through electronic or other means."  Ohio Rev. Code §

1333.61(A).

In interpreting this statute, the Sixth Circuit has held that "[f]inding liability under the

OUTSA requires *misappropriation* of a trade secret—acquisition by improper means, disclosure,

or use . . . ."  *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701,

709 (6th Cir. 2015) (emphasis in original).  And while Ohio law does not require that a party

suffer actual harm in order to secure injunctive relief, the moving party "needs to demonstrate

actual misappropriation of trade secrets to win at trial."  *Polymet Corp. v. Newman*, No. 1:16-

30

CV-734, 2016 WL 4449641, at *4 (S.D. Ohio Aug. 24, 2016); *see also State v. City of Cincinnati Citizen Complaint Auth.*, 2019-Ohio-5349, 139 N.E.3d 947, ¶ 26-29 (Ohio Ct. App. 2019), *appeal not allowed sub nom. State v. Cincinnati Citizen Complaint Auth.*, 2020-Ohio-1634, 158 Ohio St. 3d 1488, 143 N.E.3d 530, ¶ 26 (Ohio Apr. 28, 2020).  Accordingly, at this stage of litigation, RECO must show a likelihood of success in its efforts to prove that the trade secrets were either: (1) acquired by improper means, (2) disclosed, or (3) used.  Ohio Rev. Code § 1333.61(B).

Despite not having the benefit of the discovery process, the Court concludes that RECO has come forward with ample evidence to demonstrate that Defendants misappropriated trade secrets from RECO.  Specifically, Sara Bagford, RECO's Information Technology Manager and System Administrator, and Brett Creasy, a certified computer forensic examiner, collectively testified that Russo had (a) downloaded and installed Dropbox Sync so that his entire work computer would sync and backup into his Dropbox account, including any file or document that Russo pulled from RECO's network and saved to his computer; (b) used a RECO credit card to upgrade (and increase) his Dropbox internet cloud storage amount; (c) initiated forty-one (41) separate bulk download requests, of a total of 422 RECO files and folders that were stored in RECO's network; (d) removed other RECO employees' access to operator manuals for various pieces of equipment, before sharing those documents with his personal email account; (e) emailed himself at his new Republic Equipment email address, but while still employed by RECO, a link that would provide himself with access to various folders and files on RECO's network; and (f) upon termination from RECO, "wiped" his work computer of all data before returning it to RECO.  (*See generally* ECF Nos. 20-3, 20-4.)  Bagford also testified to the

31

confidential and proprietary nature of the documents and data Russo downloaded.  (*See* ECF No. 20-3 at PAGEID # 363.)

Bagford also confirmed during the hearing that it was "not the normal practice" for any RECO employee to back up their work information in this manner, and that there was no credible reason for Russo to email documents to his personal email account explaining that RECO employees do not have to be within their domain to access their email.  (Tr. at 82, 94.) Bagford also testified that Russo did not have "ownership" control rights over all of the documents and information he sought, so he requested such rights over RECO's DJJ maintenance sheets and other documents.  (*Id.* at 89-90.)  Despite having shared a close, friendly, personal relationship with Russo, Bagford also testified that while she previously would have agreed that Russo was a very trustworthy and honest person, she "would not agree to that statement now," having reviewed the digital evidence of Russo's alleged misappropriation.  (*Id.* at 101-105.)

As RECO correctly notes (and as discussed further below), under Ohio law, "an actual or *threatened* misappropriation of trade secrets may be enjoined."  *Handel's Enterprises, Inc.*, 765 F. App'x at 123 (citing *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 968 (6th Cir. 2002) (emphasis added) (citing Ohio Rev. Code § 1333.62)); *see also Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 278, 747 N.E.2d 268 (Ohio Ct. App. 2000) ("Ohio courts have held that an actual threat of harm exists when an employee possesses knowledge of an employer's trade secrets and begins working in a position that causes him or her to compete directly with the former employer or the product line that the employee formerly supported."). Here, the record appears clear that Russo acquired RECO's trade secrets by improper means. Russo now maintains that he has never "maintained any proprietary or confidential information

belong to RECO, [he has] not utilized any such material since leaving the employment of RECO, and [he does] not threaten to do so in the future." (ECF No. 26-2 at PAGEID # 501.) Given the uncontroverted forensic evidence of Russo's actions, especially in light of Russo's admission that he was leaving RECO with the intent to work with Wilson to provide service to one of RECO's largest clients, coupled with Wilson's acquisition of the Republic Equipment Holding Company's name—the company to which data was transferred, the Court finds that this statement, which has not been subjected to the rigors of cross-examination at an evidentiary hearing, strains credulity at this stage of the proceedings. At bottom, this evidence justifies a finding that there has been a threatened misappropriation of trade secrets by Defendants.

Accordingly, the Court finds that RECO has shown a threatened misappropriation of trade secrets by clear and convincing evidence, and thus has met its burden at this stage of the proceedings. Whether further discovery will help rehabilitate Defendants' actions remains to be seen. But given the limited record before the Court at this stage of the proceedings, RECO has presented a strong likelihood of success on the merits of its misappropriation of trade secrets claim, in addition to its breach of contract claim. Accordingly, the first factor of the preliminary injunction analysis soundly weighs in RECO's favor.

**B.      Irreparable Harm**

The second issue to be balanced is whether RECO has shown that it will suffer irreparable injury absent the injunction. *BNSF Ry. Co. v. Tennessee Dep't of Revenue*, 800 F.3d 262, 268 (6th Cir. 2015); *Procter & Gamble v. Stoneham*, 140 Ohio App.3d 260 (Ohio Ct. App. 2000). A movant must always demonstrate irreparable harm before an injunction will issue. *Friendship Materials v. Michigan Brick*, 679 F.2d 100, 104 (6th Cir. 1982). "Irreparable harm is an injury for which there is no adequate remedy at law, and for which damages would be

impossible, difficult, or incomplete." *Premier Dealer Serv., Inc. v. Allegiance Admr's, LLC*, No. 2:18-cv-735, 2018 WL 5801283, at *5 (S.D. Ohio Nov. 6, 2018) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir. 1992)). Further, a plaintiff "must show irreparable harm that is 'both certain and immediate, rather than speculative or theoretical' to satisfy its burden...." *NACCO Materials Handling Grp, Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 943 (6th Cir. 2007). "[T]the mere threat of harm may be sufficient to grant an injunction." *Aero Fulfillment Servs., Inc. v. Tartar*, 2007 WL 120695, *4 (Hamilton Cty., 1st Dist.). But, "the harm threatened must be irreparable, and the movant must make some showing as to why the harm cannot be remedied through compensatory damages." *Id.*

RECO argues that it will suffer irreparable harm as a result of Defendants' conduct. As explained at length above, RECO has presented substantial evidence of the following: the existence of confidential and proprietary information that it maintained under protocols designed to protect its confidentiality; that prior to his resignation from RECO to begin working with Defendant Wilson, Defendant Russo downloaded this information in a manner allowing him to store and use it for his own purposes; that he emailed this information to his private email address; that he emailed it to himself at his address at Republic, his new employer; that when he returned his company-issued electronics to RECO, his computer had been wiped and his phone had been reset to factory settings; and that DJJ was one of its largest customers. Additional evidence in the record demonstrates that Defendant Wilson formed Republic approximately one month after his resignation from RECO (Affidavit of Jeffrey S. Wilson, ECF No. 26-1, at ¶ 18) and that, following his resignation, he had communications with Trademark Metals about doing business with them and he "ha[s], in fact, done so." (*Id.* at ¶ 31.) Additionally, RECO presented

34

evidence that Defendant Russo's expectation in going to work with Defendant Wilson was to service machines for DJJ, one of RECO's largest customers, in Florida. (Tr. at 42.)

"Ohio courts have held that a substantial threat of harm exists when a defendant employee 'possesses knowledge of the employer's trade secrets and begins working in a position that causes her to compete directly with the former employer or the product line that the employee formerly supported.'" *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1007 (S.D. Ohio 2008) (quoting *Jacono v. Invacare Corp.,* No. 86605, 2006 WL 832451, at *7 (Cuyahoga Ohio App. 8th Dist.)) (citing *Procter & Gamble,* 140 Ohio App.3d at 267, 747 N.E.2d 268). "Under this framework, courts have found that injunctive relief is warranted by establishing that an employee gained intimate knowledge of an employer's trade secrets and confidential information and has begun working for a competitor in a substantially similar capacity." *Id.* (citing *Procter & Gamble,* 140 Ohio App.3d at 274, 747 N.E.2d 268).

As discussed above, RECO is likely to establish the existence of confidential trade secrets. The fact that Defendant Wilson formed a new company in RECO's industry and that Defendant Russo was planning to work for him in substantially the same capacity as his employment with RECO is uncontested on the record. That Defendant Wilson communicated with Trademark Metals, a DJJ company, to solicit its business on behalf of his new venture and that DJJ is one of RECO's biggest customers also is not in dispute. These are the circumstances in which Ohio courts grant injunctive relief to prevent irreparable harm. *Prosonic*, at 1007 (citing *Procter & Gamble,* 140 Ohio App.3d at 267, 747 N.E.2d 268; *Jacono,* 2006 WL 832451, at *7).

Moreover, courts in this District have regularly recognized that irreparable harm generally is presumed when a plaintiff has demonstrated a likelihood of success on a

35

misappropriation of trade secrets claim or in the context of a non-competition agreement implicating trade secrets. *See, e.g., Total Quality Logistics, LLC v. OTC Logistics LLC*, 2019 WL 1300223, *4 (S.D. Ohio March 21, 2019) (Black, J.) (irreparable harm found and preliminary injunction and TRO granted where plaintiff was likely to establish that defendant had access to trade secrets and began working for direct competitor in "substantially similar capacity"); *Total Quality Logistics, LLC v. Riffe*, No. 1:19-CV-23, 2019 WL 5553293, at *6 (S.D. Ohio Oct. 28, 2019) (Black, J.) (granting preliminary injunction and finding that loss of customer goodwill and loss of business constituted irreparable harm and noting that the Supreme Court of Ohio has held that injunctive relief is the appropriate remedy in cases involving misappropriation of a former employer's trade secrets in *Valco Cincinnati, Inc. v. N & D Mahining Serv., Inc.*, 492 N.E.2d 814, 819 (Ohio 1986)); *ApplianceSmart, Inc. v. DeMatteo*, No. 2:18-CV-1729, 2018 WL 6727094, at *2 (S.D. Ohio Dec. 21, 2018) (Marbley, J.) (granting TRO and noting that misappropriation of trade secrets is an irreparable loss for which monetary damages would not suffice to make a party complete); *AK Steel Corp. v. Miskovich*, No. 1:14CV174, 2014 WL 11881030, at *4 (S.D. Ohio Mar. 3, 2014) (Barrett, J.) (granting TRO and explaining that injunctive relief is warranted in the context of trade secrets and confidential information because courts have recognized that 'it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well intentioned the effort may be to do so.) (internal citations and quotations omitted); *Dayton Superior v. Yan*, 2012 WL 5497804, *5 (S.D. Ohio Nov. 13, 2012) (Rose, J.) (granting TRO and explaining that where it is shown that the defendant has misappropriated the plaintiff's trade secrets, a preliminary injunction ordinarily should issue); *Novak v. Farneman,* No. 2:10-CV-768, 2010 WL 4643002, at *6 (S.D. Ohio Nov. 9, 2010) (Marbley, J.) (denying injunctive relief but

acknowledging that "[i]rreparable harm generally results from misappropriation of intellectual property by a competitor because of the potential for lasting and unjust competitive harm that would otherwise not occur.") (internal citations omitted)); *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 867 (S.D. Ohio 2008) (Holschuh, J.) (confirming the plaintiff's view that "[t]he loss of trade secrets is usually considered an irreparable harm [that] cannot be measured in money damages and that "*where it is shown* that the defendant has misappropriated the plaintiff's trade secrets irreparable harm is generally presumed" but denying TRO because plaintiff had not demonstrated likelihood of success on misappropriation claim so presumption did not apply); *see also Procter & Gamble Co.,* 140 Ohio App. 3d at 274 (Hamilton Cty. 1st Dist. 2000) (recognizing threat of harm is a sufficient basis on which to grant injunctive relief and finding that evidence demonstrated that trade secrets had been used or were substantially likely to be used to competitor's benefit such that denial of injunctive relief was abuse of discretion ); *Columbus Steel Castings Co. v. All. Castings Co.,* 2011 WL 6931518, *10 (Franklin Ohio App. 10th Dist.) (affirming award of injunctive relief and discussing presumption of irreparable harm).

Beyond this recognized presumption, however, RECO also presented specific testimony from Joshua Gasber describing the risk to RECO of unfair competition, including the elimination of its competitive advantage, arising from the use or potential use of RECO's trade secrets. According to Gasber, the rebuilding business is an important part of RECO's business and RECO has "gotten pretty good at it over the years." (Tr. at 18.) Through its business of rebuilding and machine repairs, RECO has captured records of the work done and the "troubleshooting involved" because things break in "novel ways." (Tr. at 20.) These records allow RECO to be more efficient in its repair business. (*Id*.) With respect to rebuilding

machines, RECO has identified through experience the "sweet spot," or how to rebuild in a way to make the machines marketable and profitable. (Tr. at 37.) This "secret sauce" for RECO's business is very valuable to RECO. (*Id*.) If a competitor of RECO obtained this information, the competitor would have a "big advantage" because it would not need to invest the time and money developing the information. (*Id*.) A competitor would then be able to operate under a different cost structure from RECO, resulting in harm to RECO. (*Id.* at 37-38; 46-47.) Consequently, RECO views Defendants' conduct as posing a risk to RECO's unique competitive ability. (*Id.* at 73 ("that's the information that … gives us the difference").)

Defendants argue that RECO has not met its burden of establishing irreparable harm because it has failed to demonstrate that any harm would not be wholly compensable by money damages.[6] As the Sixth Circuit has recognized, however, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511–12 (6th Cir. 1992). In *Basicomputer,* the Sixth Circuit, in the context of an alleged breach of a non-competition covenant, recognized that loss

---

[6] More accurately, Defendants extensively argue and cite a plethora of cases that connote a truism, namely that strictly-economic damages are compensable by money damages. (*See* Tr. at pp. 151-155; ECF No. 15 at pp. 32-34; ECF No. 18 at pp. 3-10; ECF No. 24 at pp. 3-6.) To the extent that they rely on *Extracorporeal All., L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1043 (N.D. Ohio 2003), *aff'd*, 113 F. App'x 98 (6th Cir. 2004), which they describe as roughly analogous here, that case is readily distinguishable. First, in that case, unlike here, the court found that the plaintiff was not substantially likely to prevail on its claim for misappropriation of trade secrets and that the non-competition provisions were unenforceable. *Id*. at 1043, 1045. Further, because the loss of a particular contract was at issue, the court, while acknowledging the Sixth Circuit's recognition in *Basicomputer* that loss of fair competition is likely irreparable harm, found that damages were readily calculable. Again, as discussed at length in this opinion, that is not the situation here.

of fair competition is "likely to irreparably harm an employer." *Id.* Defendants' broad, albeit generally correct, argument about money damages simply fails to acknowledge the particular nature of RECO's alleged harm here. Like the plaintiff in *Basicomputer,* RECO asserts the precise type of harm that is not easily calculated – the loss of fair competition and the elimination of RECO's competitive advantage – that Defendants' unrestrained conduct will cause. *See Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 32–33 (6th Cir. 2011). Accordingly, the Court finds that RECO adequately has demonstrated that irreparable harm would ensue absent a preliminary injunction.

**C.    Undue Hardship to Others**

The third factor in the preliminary injunction analysis is whether granting the injunctive relief would harm the party enjoined or other non-parties. Consequently, the Court must balance the irreparable injury the Plaintiff would suffer if its motion for injunctive relief is denied against any harm which would be suffered by others, including Wilson, Russo, and Republic Equipment, as a result of granting the injunction. *Total Quality Logistics, LLC v. Riffe*, No. 1:19-CV-23, 2019 WL 5553293, at *6 (S.D. Ohio Oct. 28, 2019) (citing *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982)).

Notably, Defendants do not contend that they would suffer undue hardship if the Court enjoined them from using the information they acquired from RECO. Rather, Defendants appear to rest on Russo's statement that he has never "maintained any proprietary or confidential information belong to RECO, [he has] not utilized any such material since leaving the employment of RECO, and [he does] not threaten to do so in the future." (ECF No. 26-2 at PAGEID # 501.) According to this admission, then, an order prohibiting Defendants from using any of the trade secrets and other confidential or proprietary information that Russo acquired

from RECO, and requiring them to return all misappropriated and/or deleted information to RECO, surely should have no impact on Defendants' business operations.

On the other hand, however, Wilson argues that Section 3.02 of the Employment Agreement "prohibit[s] Wilson competing even where RECO is [] not in a position to offer its services." (ECF No. 15 at PAGEID # 217.) "These covenants, if enforced, thus would further bar Wilson from engaging in business with companies who, through no influence of Wilson, *choose* not to do business with RECO." (*Id.* (emphasis in original).) "By definition . . . the covenants impermissibly stifle <u>ordinary</u> competition." (*Id.* (emphasis in original).) The Court agrees with Wilson, and notes that it has the authority to modify the scope of a restrictive covenant to render it reasonable. *See Relo Franchise Servs., Inc. v. Gilman*, No. 1:18-CV-578, 2018 WL 7288084, at *13 (S.D. Ohio Oct. 5, 2018), *report and recommendation adopted*, No. 1:18-CV-578, 2019 WL 324215 (S.D. Ohio Jan. 25, 2019) ("Under Ohio law, a court may modify an overly broad restrictive covenant in order to narrow its scope to that which is no more than necessary to protect the employer's legitimate business interests.") (internal citations omitted); *see also Avery Dennison Corp. v. Kitsonas*, 118 F.Supp.2d 848, 854 (S.D. Ohio 2000) (modifying the scope of the restrictive covenant to prohibit employment with only those companies that sold products "substantially similar" to, or "competitive" with, the prior employer).

Accordingly, the Court finds that the third preliminary injunction factor weighs in RECO's favor as to the misappropriation claim, but weighs slightly in Wilson's favor as to the contract claim.

**D.      Public Interest**

The final factor courts consider is whether granting the injunction would affect the public interest.  Under Ohio law, "[p]reserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest."  *Total Quality Logistics, LLC*, 2019 WL 1300223, at *5 (citing *UZ Eng'red Prods. Co. v. Midwest Motor Supply Co., Inc.*, 770 N.E.2d 1608, 1081 (Ohio Ct. App. 2001)).  The Court finds that a preliminary injunction in this case would serve those precise interests.  Accordingly, this factor also weighs in favor of granting injunctive relief.

In balancing the four factors pertaining to injunctive relief, especially considering the high probability of success on the merits, as well as the risk of irreparable harm, the Court finds that a preliminary injunction against Defendants Wilson, Russo, and Republic Equipment is appropriate to preserve the status quo until this case is decided on the merits. The scope of the injunction is detailed below.

## V. CONCLUSION

Based upon the foregoing, Plaintiff RECO Equipment, Inc.'s Motion for Preliminary Injunction, ECF No. 20, is **GRANTED** to the following extent.  The following injunctive relief is put in place effective immediately:

1.  Defendant Wilson is ordered to comply with the terms of the Employment Agreement between RECO and Defendant Wilson, dated January 23, 2019.  With regard to Section 3.02, the Court **STRIKES** subsection (a) from the definition of "Competitive Activity" as unreasonable.  All other provisions of the Employment Agreement remain in effect and enforceable.

2.  Defendants are enjoined from accessing, using, disseminating, or disclosing RECO's trade secrets, as described herein.

3.  Defendants are enjoined from soliciting or performing services for RECO's customers to which RECO's trade secrets, as described herein, pertain.

4.  Defendants are ordered to return all misappropriated and/or deleted information to RECO by January 20, 2021.

**IT IS SO ORDERED.**

/s/ *Elizabeth A. Preston Deavers*

DATED:  November 20, 2020       **ELIZABETH A. PRESTON DEAVERS**
**CHIEF UNITED STATES MAGISTRATE JUDGE**